**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **PAUL C. THOMPSON, JR.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:17cv00010** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **H. W. CLARKE, *et al.*** | ) | **By:  Norman K. Moon** |
| **Defendants.** | ) | **United States District Judge** |
| | ) | |

Paul C. Thompson, Jr., an inmate proceeding *pro se*, filed this action under the Civil

Rights Act, 42 U.S.C. § 1983, alleging that employees of the Virginia Department of Corrections

("VDOC") violated his constitutional and state law rights between November 2014 and March

26, 2015.  Before me now is a motion for partial summary judgment (Docket No. 56) addressing

Count (2) of Thompson's 100-page complaint, alleging deprivations of his Eighth Amendment

rights.[1]  After review of the record, I conclude that the motion must be granted except as to

Thompson's claim against one supervisory officer for failure to protect him from self-harm.

## I.

Thompson's § 1983 complaint sets out five "counts," each encompassing numerous

claims arising from events that occurred in 2014 and 2015 while he was confined at River North

Correctional Center ("River North"):[2]  (1) retaliation for Thompson's past lawsuits and

grievances against prison officials, in violation of the First and Fourteenth Amendments; (2)

---

[1]    These defendants have also filed motions to dismiss pursuant to Rule 12(b)(6) as to Count (1) alleging retaliation in violation of the First and Fourteenth Amendments; Count (3) alleging Fourteenth Amendment violations; Count (4) alleging state law claims of assault; and Count (5) alleging violations of Article I, Sections 9, 11, and 12 of the Virginia Constitution.  *See* Docket No. 42.  I have addressed the motions to dismiss in a separate opinion and order.  Because the defendants address the retaliation claims in their motions to dismiss, they do not address in their motion for partial summary judgment the many assertions of retaliation in Count (2) and focus only on its alleged Eighth Amendment claims.

[2]    On March 26, 2015,Thompson was transferred from River North to Red Onion State Prison, where he is currently confined.

deliberate indifference to hazardous conditions or serious medical needs and excessive force, in violation of the Eighth Amendment; (3) denial of substantive and procedural due process and equal protection, in violation of the Fourteenth Amendment; (4) state law claims of assault; and (5) violations of Article 1, Sections 9, 11, and 12, of the Virginia Constitution.

The movant defendants here are H.W. Clarke, VDOC Director; H. Ponton, VDOC Regional Administrator; J.E. Parks, VDOC Director of Offender Management Services ("OMS"); Keith Dawkins, an OMS supervisor; G. Jones, who worked in OMS; B. Wright, former Warden of River North; B. Booker, Assistant Warden; Major Mullins and Lt. Evans, supervisors; Doss, the Unit Manager in Building (A); Lt. Miller, Lt. Whitt, Lt. Colna (referred to in the complaint as Sgt. Coleman), and Correctional Officer ("C/O") Shaffner, all of whom worked in Building (A); Sgt. Jones and Sgt. Thompson, supervisors in Building (A); C/O J. Rosenbaum and C/O A. Hash, transportation officers; and Lt. Montgomery, also involved in transportation.  Their motion for partial summary judgment (Docket No. 56) addresses only Count (2), alleging these Eighth Amendment claims:  (A) giving him a "rough ride" in a medical transport van on November 27, 2014, and refusing him a wheelchair afterward; (B) removal of Thompson from protective custody status on December 8, 2014; (C) subjecting Thompson to "psychological torture" from November 17, 2014 through March 26, 2015 by denying him a Westlaw user manual and cold weather clothing for outside recreation; (D) inadequately treating Thompson's low blood pressure condition; (E) allowing Thompson to possess a razor that he used to cut his wrist on January 15, 2015; (F)(i) forcibly extracting Thompson from his cell on January 15, 2015, and (ii) over-tightening his ambulatory wrist restraints; (G) placing Thompson

on suicide precautions three times in 2015; and (H) delaying an aspiration treatment for Thompson's left knee.[3] (Compl. ¶ 208, Docket No. 1.)

Thompson has responded in opposition to the defendants' motion for summary judgment as to these claims (Docket Nos. 108, 110, 111, 112, and 117). Thus, I conclude that these motions are ripe for decision. The facts relevant to each incident, I have summarized in the light most favorable to Thompson, unless otherwise noted.[4]

## II.

### A. Standard of Review

I may grant summary judgment for the defendants if they "show[ ] that there is no *genuine* dispute as to any *material fact* and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). To survive defendants' motion, Thompson must present "evidence that would support a jury verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

In addressing the summary judgment arguments, I must hold Thompson's *pro se* complaint, "however inartfully pleaded" it may be, "to less stringent standards than formal

---

[3]    Thompson mentions retaliation throughout his complaint, including Count (2). I have addressed his retaliation claims, however, in separate opinions addressing the defendants' motions to dismiss.

[4]    Thompson's complaint lacks a chronological description of all relevant events, a critical part of a proper complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that plaintiff's obligation to provide the "grounds" of his "entitlement to relief" under Fed. R. Civ. P. 8(a) "requires more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" and as such, "[f]actual allegations must be enough to raise a right to relief above the speculative level") (citations omitted). Instead, Thompson's complaint scatters partial descriptions of occurrences, often without dates or defendants' names, in multiple places throughout the 100-page pleading. In his responses to the defendants' motions, Thompson contends that all necessary details about the events at issue were provided to the defendants in his many grievance documents, essentially incorporating these documents by reference into his complaint. Thus, for the sake of clarity, parts of this factual summary are based on Thompson's submissions as a whole, including copies of his informal complaints and grievances now in the record. (*See gen.* Compl., Docket No. 1; Pl.'s Exhibits ("Ex."), Docket No. 130.) Other facts are taken from Thompson's affidavits (*see, e.g.,* Docket Nos. 107, 110, 111, and 112-114); from affidavits from the following individuals: S. Fletcher, Qualified Mental Health Professional ("QMHP") and Psychology Associate I at Red Onion State Prison; defendants J. Thompson, Lt. Colna, and Walls, from River North; and from camcorder video footage of the cell extraction and application of ambulatory restraints on January 15, 2015, offered in support of the defendants' summary judgment motion (Docket No. 57).

pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).[5]  I must also draw all reasonable inferences from the *facts* in favor of Thompson, as the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).  However, Thompson "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.  Mere groundless generalizations and unsupported speculations cannot create a genuine issue of fact and are thus insufficient to defeat a summary judgment motion. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992).

### B.  Time-barred Claims: Claim (2)(A)

On November 17, 2014, C/O Rosenbaum drove Thompson to an appointment with a neurologist, and C/O Hash rode in the passenger seat.  (Compl. ¶ 111, Docket No. 1.)  The medical transport van had no seat belts or safety restraints.  (*Id.* at ¶ 112.)  Thompson was on a seat in the back of the van, in handcuffs, leg irons, and a "shock-belt attached around his chest under his clothes."  (*Id.* at ¶ 114.)  During that trip, in snowy and rainy conditions, Thompson could see on the speedometer that Rosenbaum reached speeds of 63 miles per hour on the highway and speeds of 85 miles per hour on the interstate.  (*Id.* at ¶ 116.)  Thompson had "difficulty not being thrown around."  (*Id.* at ¶ 117.)

At the hospital, Thompson confronted Rosenbaum about his driving, and they argued. (*Id.* at ¶ 20.)  After the medical examination, Rosenbaum resumed driving "at a high rate of speed, really even more extrem[e] than that previously experienced."  (*Id.* at ¶ 124.)  Thompson was "thrown from where he was seated next to the window of the front cab to the rear door of the

---

[5]     I have omitted internal quotation marks, alterations, or citations here and throughout this opinion, unless otherwise noted.

van" and was "stunned and unconscious for a period of time." (*Id.* at ¶ 125.) Thompson suffered injuries to his left knee, left chest, and left arm and hand. (*Id.* at ¶ 126.)

Once the van arrived back at River North, Lt. Montgomery refused Thompson access to a wheel chair, requiring him to walk 200 yards with staff on each side of him with his arms over their shoulders. (*Id.* at ¶ 127.) Thompson was then treated by medical, and he later sought follow-up care for his injuries. (*Id.* at ¶ 128, 30.) Wright, Booker, Montgomery, Rosenbaum, and Hash conspired to cover up the November 17, 2014 transport incident by destroying the video footage from the transport. (*Id.* at ¶ 160.)

The defendants argue that Thompson's claims concerning the van incident on November 17, 2014, were not timely filed under the applicable statutes of limitations. Thompson responds that the statutes' limitation periods should be tolled for various reasons. I find the defendants' arguments more persuasive and will grant their motion for summary judgment on as to the claims arising from the van incident.

Federal law dictates that, for uniformity's sake, all § 1983 actions arising from events in Virginia are governed by its two-year, residual statute of limitations for all personal injury cases, Virginia Code Ann. § 8.01-243(a). *See Owens v. Okure*, 488 U.S. 235, 250 (1989) (finding that in states with multiple statutes of limitations for personal injury claims, "courts considering § 1983 claims should borrow the general or residual statute [of limitations] for personal injury actions"); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 677 (W.D. Va. 2001) (applying *Owens* standard to hold that Va. Code Ann. § 8.01-243(A) applies to prisoner § 1983 claims). Section 8.01-243(A) allows a litigant two years from the time his claim accrues to file that claim in court. A § 1983 claim accrues "when the plaintiff possesses sufficient facts about the harm done to him

that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995).

The van incident occurred on November 17, 2014. Because he knew immediately of the harm he had allegedly suffered from the rough ride and the denial of a wheel chair, his claims against Rosenbaum, Hash, and Lt. Montgomery accrued that day, and his statutory filing period began to run. Thompson filed his complaint in this court on or about January 1, 2017,[6] two years and six weeks after his claims accrued. Thus, these § 1983 claims about the van incident on November 17, 2014 are barred under Va. Code § 8.01-243(A), unless Thompson shows some basis for tolling of the statutory filing period.

When a state's limitations period is used in a § 1983 action, the state's accompanying tolling rules must also be used under. *Board of Regents v. Tomanio*, 446 U.S. 478, 484 (1980). The Supreme Court of Virginia has held that "statutes of limitations are strictly enforced and exceptions thereto are narrowly construed. Consequently, a statute should be applied unless the General Assembly clearly creates an exception, and any doubt must be resolved in favor of the enforcement of the statute." *Arrington v. Peoples Sec. Life Ins. Co.*, 459 S.E.2d 289, 299 (Va. 1995).

Thompson contends that the filing period under § 8.01-243(A) should be tolled during the time he spent exhausting his administrative remedies about the van incident, process he completed on January 5, 2015. (Compl. ¶ 40, Docket No. 1.) This argument lacks merit. Virginia law does not include a provision that allows for tolling of the statute of limitations while

---

[6]     January 1, 2017 is the date on the signature page of Thompson's verified complaint, Docket No. 1. I will assume for purposes of this opinion that he also delivered the complaint to prison authorities for mailing and consider it as having been filed on that date, rather than on January 9, 2017, when the court received and docketed it. *See Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 735-36 (4th Cir. 1991) (finding inmate's § 1983 action commenced for statute of limitations purposes when he delivers complaint to prison authorities for mailing to court).

an inmate exhausts his administrative remedies. *Wagner v. Barnette*, No. 7:12cv441, 2014 U.S. Dist. LEXIS, at *14, 2014 WL 695388, at *4 (W.D. Va. Feb. 24, 2014).

Thompson contends that his statutory filing period should be tolled under Va. Code § 8.01-229(A)(2)(b), because an Administrative Law Judge concluded he was "disabled" for purposes of Social Security Administration benefits and because he spent short periods on suicide precautions in January and March 2015. Section § 8.01-229(A)(2)(b) tolls the statute of limitations "[a]fter a cause of action accrues . . . (b) if a person entitled to bring such action becomes incapacitated, the time during which he is incapacitated shall not be computed as any part of the period within which the action must be brought" except in limited circumstances not applicable here. (*Id*.) "[A] person shall be deemed incapacitated if he is so adjudged by a court of competent jurisdiction, or if it shall otherwise appear to the court or jury determining the issue that such person is or was incapacitated within the prescribed limitations period." § 8.01-229(A)(2)(b).

In applying this section, courts have adopted the more specific definition of "incapacitated" in Va. Code § 37.2-1000 (now codified at § 64.2-2000):

> "Incapacitated person" means an adult who has been found by a court to be incapable of receiving and evaluating information effectively and responding to people, events, or environments to such an extent that the individual lacks the capacity to (i) meet the essential requirements for his health, care, safety, or therapeutic needs without the assistance or protection of a guardian or (ii) manage property or financial affairs or provide for his support or for the support of his legal dependents without the assistance or protection of a conservator. A finding that the individual displays poor judgment alone shall not be considered sufficient evidence that the individual is an incapacitated person within the meaning of this definition.

*Calvert v. State Farm Fire & Cas. Co.*, No. 5:12cv17, 2012 U.S. Dist. LEXIS 94851, at *24, 2012 WL 2804838, at *9 (W.D. Va. July 10, 2012) (holding that plaintiff's depression, anxiety, physical ailments, ongoing medical and psychological treatment, prescription drug therapies, loss

of employment and loss of ability to drive a car did not qualify her as "incapacitated" under § 8.01-229(A)(2)(b)); *see also Kumar v. Glidden Co.*, No. 2:05-CV-499, 2006 LEXIS 18964, at *26, 2006 WL 1049174, at * 9 (E.D. Va. Apr. 13, 2006) (holding that plaintiff was not incapacitated for tolling purposes, because she was able to "conduct her own affairs, to work, and to raise her children," despite her listed medical and mental health issues, including panic disorders, bi-polar/manic depression, and impaired memory).

Thompson's extensive litigation history in federal court while confined at River North in 2014 and 2015 shows that he was not so "disabled" or incapacitated that he could not litigate or pursue administrative remedies.[7] His grievance documents and other filings in this case also demonstrate that he could capably receive, evaluate, and communicate information and respond to people and events around him. As later discussed, suicide precautions at River North withhold all personal property items from the inmate, including pen and paper. Even if the statutory filing period were tolled during the periods when Thompson was on suicide precautions, for a total of two weeks, his complaint was still filed a month too late.

Lastly, Thompson contends that equitable principles should operate to toll the statute of limitations because certain individuals allegedly obstructed his ability to file this action. *See* Va. Code § 8.01-229(D); *Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014). According to Thompson, "defendants" delayed returning his legal materials after suicide precautions ended. He also alleges that a "significant portion" of legal materials he possessed at River North took months to reach him after his transfer on March 26, 2015, to Red Onion State Prison. Thompson

---

[7] During the time period when his Eighth Amendment claims in this case arose and thereafter, Thompson has pursued civil rights actions with the United States District Court for the Eastern District of Virginia and this court. *Thompson v. Dolan*, No. 2:12cv209, was docketed on April 18, 2012, was closed on September 23, 2015, but remains pending since December 18, 2017, due to a remand in part in by *Thompson v. Commonwealth*, 88 F.3d 89, 93 (4th Cir. 2017). *Thompson v. Clarke*, No. 2:14cv86, was docketed on February 11, 2014, and dismissed on March 9, 2017. *Thompson v. Clarke*, No. 2:15cv439, was docketed on October 1, 2015, and remains pending. The case before me was docketed on January 9, 2017.

offers no explanation as to why the alleged withholding of his legal materials prevented him from filing his complaint about the rough ride and the denial of the wheel chair, using the simple form provided for inmates filing complaints under 42 U.S.C. § 1983. Filling out that form or otherwise making "(1) a short and plain statement of the grounds for the court's jurisdiction . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought" requires no "legal materials." Fed. R. Civ. P. 8(a). *See Barnett v. Williams*, 865 F.2d 1256 (4th Cir. 1988) (finding § 8.01-229(D) inapplicable where plaintiff's only claim was interference with access to legal materials before filing the complaint).

For the reasons stated, I conclude that Thompson is barred under Va. Code § 8.01-243(A)(2) from pursing his Eighth Amendment claims concerning the van incident and wheel chair denial on November 17, 2014.[8] Accordingly, I will grant the defendants' motion for summary judgment on Count (2)(A).

### C. Excessive Force

On the afternoon of January 14, 2015, a nurse was distributing medication to inmates assigned to Restrictive Housing (also known as the Segregation Unit), where Thompson was housed. (Defs.' Mem. Supp. Mot. Summ. J. Attach. 1, Colna Aff. ¶ 4, Docket No. 57-1.) When the nurse asked Thompson if he wanted his medications, he said he did. (*Id*. at ¶ 5.) The nurse gave him a cup to put water in and said she would only put crushed medication into the water so that he could take his medication. (*Id.* at ¶ 6.) Thompson reached out of the tray slot in his cell

---

[8]      Thompson's allegations about a cover up of the van incident after the fact, through purposeful destruction of video footage from inside the van, for instance, are likely not time-barred. Compl. ¶¶ 160-61, Docket No. 1. The defendants are, nevertheless entitled to summary judgment on such claims because Thompson fails to state that "a serious or significant physical or emotional injury resulting from" the alleged cover up, a required element of an Eighth Amendment claim. *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).

door, slapped the medication packet out of the nurse's hand, and threw the cup of water on her.[9] (*Id.* at ¶ 7.)  He was charged with a disciplinary offense for aggravated assault for slapping the nurse's hand.  (*Id.* at ¶ 8.)

The next morning, the same nurse asked Thompson if he wanted his medication, and he said that he did.  (*Id.* at ¶ 9.)  Once the nurse had placed his medications in the cup of water, Thompson threw the cup out of the tray slot, hitting the nurse and an officer.  (*Id.* at ¶ 10.)  He then threatened to kill the nurse and her entire family.  (*Id.* at ¶ 11.)  Officers then went to Thompson's cell and ordered him to "cuff up"[10] so that cups and other items could be removed from his cell, Thompson refused to obey the order to "cuff up."  (*Id.* at ¶ 12.)

Later that same morning while performing their rounds, officers noticed that Thompson had placed what appeared to be papers over his window, blocking the view into his cell.  (*Id.* at 13.)  Lt. Colna went to Thompson's cell and repeatedly asked him to come to the cell door to be restrained and to remove the paper from the window, but Thompson did not comply.  With prior medical staff approval, Lt. Colna administered a one-half to one second burst of oleoresin capsicum ("OC") spray[11] through the tray slot in the cell door.  Thompson still did not obey the order to "cuff up."

Lt. Colna then assembled a team to remove Thompson from his cell.  (*Id.* at ¶ 14.)  At approximately 11:32 a.m., Lt. Colna repeatedly asked Thompson to come to the cell door to

---

[9]    Thompson complains that Lt. Colna has no personal knowledge about these incidents, because he was not present.  Thompson Aff. Opp'n ¶ 4, Docket No. 114.  Thompson does not dispute the accuracy of the account, however, or the fact that officers later considered these outbursts when deciding to remove him from his cell.

[10]    To "cuff up" means that an offender must come to his cell door to be restrained by officers who apply restraints from the outside of the cell door. This is a common term used by officers and offenders and it would have been very clear to Thompson what was being asked of him.  Colna Aff. ¶ 12, n.1.

[11]    OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose.  *See, e.g., Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

"cuff up," but Thompson did not comply. At that time, there appeared to be blood on the papers covering Thompson's cell window. (*Id.* at ¶ 15.) Because it appeared that Thompson had injured himself, had blocked his window, and would not "cuff up," a decision was made to deploy the extraction team to prevent Thompson from continuing to hurt himself. (*Id.* at ¶ 35.) The video footage shows that as the cell door was opened remotely, a team member entered the cell, holding a plexiglass shield that he used to herd Thompson to the back wall of the cell and hold him there, while the other officers surrounded him and placed him in shackles and handcuffs. (*Id.* at ¶¶ 16-17; DVD: RNCC, Thompson, P, #1134145, Cell Extraction, Cell Restraints, January 15, 2015 (on file with the court), Docket No. 59.) Once inside Thompson's cell, Lt. Colna saw what appeared to be blood on the walls of the cell and on Thompson's bedding. (*Id.* at ¶ 19.)

The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). To resolve a claim that prison staff's excessive force violated the Eighth Amendment, the court must determine whether the force applied was "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-21. Whether the force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on factors such as the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* at 321; *see, e.g., Wilkins v. Gaddy*, 559 U.S. 34 (2010).

Thompson vaguely alleges that the defendants violated the Eighth Amendment by using excessive force in removing him from his cell. Thompson alleges no other facts concerning the

extraction. Defendants submit a video of the extraction which shows them giving Thompson multiple directions to come to the door to "cuff up," all of which Thompson refuses. Thompson does not allege, and the video does not plainly demonstrate, that the defendants acted maliciously or sadistically for the purpose of causing harm during the cell extraction. With no evidence to the contrary, I conclude that the force used by the officers was done in a good faith effort to maintain or restore discipline due to Thompson's continued refusal to comply with orders. Accordingly, I will deny defendants' motion for summary judgment as to Thompson's excessive force claim against the defendants.

### D. Deliberate Indifference

To establish that living conditions constitute cruel and unusual punishment, a prisoner must prove (1) that "the deprivation of a basic human need was objectively sufficiently serious," and (2) that "subjectively the officials acted with a sufficiently culpable state of mind." *Strickler*, 989 F.2d at 1379. Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See, e.g., Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). In order to demonstrate such an extreme deprivation, a prisoner must allege "a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler*, 989 F.2d at 1381. The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "Deliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. It requires that a prison official actually know of and disregard

an objectively serious condition, medical need, or risk of harm. *See id.* at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

### 1. Conditions of confinement

#### a. Living conditions: Claims (2)(B) and (2)(C)

Thompson alleges that the defendants imposed cruel and unusual living conditions when they removed him from protective custody (Compl. ¶ 208(2); subjected him to "psychological torture" (*Id.* at ¶ 208(3)); failed to provide his pod with a Westlaw user manual (*Id.* at ¶ 137); and failed to provide him with cold weather clothing for outside recreation. (*Id.* at ¶ 147.) These alleged deprivations simply do not rise to the level of Eighth Amendment violations. They are not extreme, they do not constitute the denial of a basic human need, and they did not cause Thompson any physical harm. Thompson's allegations that he was psychologically tortured fail to state what, exactly, any particular prison official did to him that constituted "torture." To the extent Thompson is alleging that his stay in the segregation unit itself was "torture" or a violation of the Eighth Amendment, his claim has no legal basis. *See, e.g., In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (holding that an indefinite duration of segregation does not automatically render segregation unconstitutional); *Beverati v. Smith*, 120 F.3d 500, 514 (4th Cir. 1997) (holding that an extended stay in administrative segregation was not, on its own, a violation of the Eighth Amendment). Thus, the deprivations Thompson alleges, related to the conditions of his confinement generally, fail to state an Eighth Amendment claim. I will grant summary judgment for the defendants as to Claims (2)(B) and (2)(C).

**b. Use of restraints: Claim (2)(F)(ii)**

After extracting Thompson from his cell on January 15, 2015, the extraction team carried him to Cell A-201, a "safety cell" that contains only a padded bed in the center of the room, a sink, and a toilet; a camera inside the cell allows officers to monitor the cell's occupant at any time. (*Id.* at ¶ 22.) Team members placed Thompson face down on the bed in cell A-201 and held him there until medical staff arrived. (*Id.* at ¶ 21.)

Meanwhile, Lt. Colna removed the leg irons and placed ambulatory restraints on Thompson's ankles. (*Id.* at ¶ 23.) A registered nurse then treated and bandaged the self-inflicted cuts on Thompson's left wrist, and Lt. Colna replaced the handcuffs with ambulatory restraints. (*Id.* at ¶¶ 24, 26.) The parts of the ambulatory restraints that touched the skin on Thompson's wrists and ankles were made of a soft, durable foam-like material and per policy, were to be applied leaving enough room to fit at least two fingers between the restraints and his skin.[12] (*Id.* at ¶¶ 27-29.) Once the restraints were on Thompson's wrists, a nurse inspected all the restraints and noted that she could fit two fingers between the restraints and Thompson's skin. (*Id.* at ¶ 29.) She also checked his circulation and stated that he had "good sensation in all four extremities." (*Id.*) With the restraints in place, the team removed Thompson's clothing to prevent him from using it to further injure himself.[13] (*Id.* at ¶ 25.)

Thompson claims that during application of the wrist restraints, he complained to Lt. Colna that the left wrist restraint was too tight. (Mem. Opp'n Mot. Summ. J. 19, Docket No. 117-1.) Lt. Colna reports that he left sufficient space between the restraints and Thompson's

---

[12]    The wrist restraints are attached to a waist belt secured around the inmate's midsection. In these restraints, and inmate is are able to walk in short strides and move his hands, allowing him to move to the toilet and to use the restroom without assistance. Colna Aff. ¶ 27.

[13]    Inmates who inflict self-harm sometimes continue to try to harm themselves by eating non-edible items – such as clothing – or by using the clothing to fashion a noose or device with which they could strangle themselves. Colna Aff. ¶ 25.

skin, and he denies that Thompson made any complaint about a restraint being too tight before the cell extraction team left him in the cell, face down on the bed.  (Colna Aff. ¶ 29-30, Docket No. 57-3.)  At about noon, the extraction team re-entered Thompson's cell and repositioned him from a face-down position to a seated position on the padded bed.  He was awake and responsive, but voiced no complaints about discomfort to his wrists or ankles.  (*Id.* at ¶ 31.)

Thompson states that, hours later, Lt. Colna and Nurse Wells returned to the cell and loosened the wrist restraints; Thompson argues this return visit proves that Lt. Colna "intentionally applied the restraints on Thompson's hands and arms to[o] tightly, cutting off normal blood circulation, [and] causing Thompson's hands and arms to become numb."  (Mem. Opp'n Mot. Summ. J. 19, Docket No. 117-1.)  Officers released Thompson from ambulatory restraints at about 8:45 p.m. on January 15, 2015, without incident, a nurse rechecked his self-inflicted wound, and he remained in Cell A-201 under suicide precautions.  (Colna Aff. ¶ 34, Docket No. 57-3.)

Thompson alleges that the tight restraints caused his wrist to start bleeding, so that Nurse Wells had to reglue the wound.  He claims to have suffered long-term numbness in his left hand and wrist from Lt. Colna's actions.  (Compl. ¶ 158, Docket No. 1.)

I conclude that Thompson fails to show any disputed material fact to persuade a reasonable fact finder that Lt. Colna acted with deliberate indifference.  Without any medical expertise himself, Lt. Colna could rightfully rely on Nurse Wells' assessments that the restraints were sufficiently loose, that Thompson's circulation was fine, and that he had good sensation in his hands.  *See Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (holding that nonmedical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment

for an inmate's conditions). I will grant the defendants' motion for summary judgment as to Claim (2)(F)(ii).

## 2. Suicide Precaution Status: Claim (2)(G)

Thompson was first placed on suicide precautions at River North from January 15 until January 22, 2015. (Fletcher Aff. ¶ 8, Docket No. 57-1.) He was also subject to suicide precautions between from January 26 to 30, 2015, and from March 2 to 5, 2015. He apparently contends that living conditions in this status violate the Eighth Amendment.

After the cell extraction on January 15, 2015, a qualified mental health professional ("QMHP") assessed Thompson's mental state and placed him on suicide precautions. (Colna Aff. ¶ 33, Docket No. 57-3.) Only a QMHP can place an inmate on suicide precautions or remove him from that status and may adjust the protective conditions ordered for the inmate to fit the circumstances. (Fletcher Aff. ¶ 9, 12.) The QMHP ordered the following suicide precautions for Thompson: a fifteen-minute watch (meaning that officers would have to visually check on Thompson every fifteen minutes), confinement in a "strip cell,"[14] a clinical precautionary diet,[15] and property items limited to a safety smock.[16] Thompson also to keep his hands and head visible at all times and was not permitted to cover the camera in his cell. (*Id.* at ¶ 10.) On January 17, a QMHP determined that it was safe for Thompson to have a safety blanket; two days later he permitted Thompson a pair of standard boxer shorts; the next day, a pair of socks; the following day, a t-shirt. (*Id.* at ¶¶ 13-16.) On January 22, 2015, a QMHP

---

[14] A "strip cell" contains only a bed, toilet, and sink, unless a QMHP has determined it is safe for the inmate under suicide precautions to possess clothing items or use eating utensils. (Fletcher Aff. ¶ 10, n.1.)

[15] The clinical precautionary diet ordered for Thompson permitted him only a flexible food tray and "finger foods." (Fletcher Aff. ¶ 10, n.2.

[16] A safety smock or safety blanket is constructed of durable but flexible material designed to resist tearing, burning, and knotting. (Fletcher Aff. ¶ 10, n.3, 4).

determined that Thompson could be removed from suicide precaution and returned to his usual housing. (*Id*. at ¶ 17.) On January 26, 2015, a QMHP determined that Thompson needed to be maintained on suicide precaution again, under similar conditions for four days. (*Id*. at ¶ 18-19.) Thompson does not allege experiencing any different conditions while on suicide precautions for four days in March 2015.

I conclude that Thompson presents no genuine issue of material fact in dispute showing a deprivation of constitutional rights from the conditions on suicide precautions. While on this status, an inmate is separated from personal property for a time, including normal clothing, bedding, and eating utensils. No evidence before me suggests, however, that Thompson failed to receive all basic human needs while in this protective housing status, such as food, water, shelter, a body covering, a place to sleep, and access to a toilet. In addition, Thompson does not identify any "serious or significant physical or emotional injury resulting from" the living conditions on suicide precautions. *Strickler*, 989 F.2d at 1381. On the contrary, the suicide precautions are designed to prevent, not cause, harm to an inmate at risk of harming himself without those precautions. Finally, the defendants' evidence establishes that only a QMHP can place an inmate on suicide precautions, and none of the defendants have that authority. Thus, Thompson cannot show that their individual actions caused him to be assigned to suicide precautions. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). I will grant the defendants' motion for summary judgment as to Claim (2)(G).

### 3. Denial of medical care: Claims (2)(D) and (2)(H)

"Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The inmate must prove that, objectively, he was suffering from a serious medical

need and that, subjectively, the defendant was deliberately indifferent to that need, meaning that he was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An official's inadvertent failure to provide appropriate medical care, or an inmate's mere disagreement with the medical judgments of a doctor or a nurse does not constitute deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (same).

Thompson's claims about his medical care concern primarily his medical providers at River North—a doctor and four nurses ("the medical defendants"). These defendants, represented by a different attorney, filed their own dispositive motions. In a separate opinion, I have addressed Thompson's claims against them. I concluded that his complaints about his medical care are based on his belief that he, without any medical training, knew better than the doctor and nurses what medical care was appropriate for his symptoms, when he should have it, and what was causing those symptoms. Such disagreements between a patient and his medical care givers are not actionable under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (holding that decisions as to whether or when to order particular medical procedures or alter course of treatment are "classic example[s] of . . . medical judgment" not actionable under § 1983). Accordingly, I granted the medical defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

To bring a medical treatment claim against non-treating prison officials, an inmate must show that these officials were personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or were indifferent to a prison physician's misconduct. *Miltier*, 896 F.2d at 854. Such prison personnel may rely on the opinion of the medical staff as to the proper course of treatment for an inmate's conditions. *Id.*

It is not the function of prison administrators or officers who have no medical training to second guess the good faith treatment decisions of licensed physicians. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

Thompson fails to show how the non-medical defendants named in Count (2) of his complaint were personally involved in a denial of treatment or that they deliberately interfered with a prison doctor's course of treatment. They could rightfully rely on the doctor's judgment regarding appropriate tests, medication doses, and procedures to address Thompson's blood pressure and knee conditions. Because I have already decided that Thompson's complaint states no viable Eighth Amendment claim against his care providers regarding his course of treatment, the non-medical defendants cannot be liable for any tacit authorization of, or indifference to, the care providers' actions. *Miltier*, 896 F.2d at 854. Accordingly, I will grant the motion for summary judgment as to Claims (2)(D) and (2)(H).

### E. Failure to Protect: Claim (2)(E)

In the River North segregation area in 2014 and 2015, inmates were prohibited from possessing razors in their cells, but were permitted to use a safety razor to shave while showering. (*See gen.* Mem. Supp. Mot. Summ. J, J. Thompson Aff., Pl. Aff., Docket Nos. 57-2, 112.) The showers were located in an area separate from inmates' cells. To take a shower, while still in his cell, an inmate would first remove his clothes and undergo a visual strip search by two officers observing through his cell door window to spot any contraband. They would also search his clothes, allow him to redress, place him in handcuffs and shackles, escort him to the shower cell, lock him behind a metal mesh door, and remove his restraints. At that point, they would issue him items to use while showering, including a safety razor if requested. At the end of the shower, the officers were to visually strip search the inmate again, retrieve all safety razors, issue

him clean clothes to put on, and then restrain him and escort him back to his cell. Officers would also conduct random searches of segregation inmates' cells for any prohibited items, such as razors.

On December 3, 2014, officers charged Thompson with a disciplinary infraction for allegedly possessing razors, which are contraband. (Compl. ¶ 176, Docket No. 1.) He reports having a history of being treated for mental illness throughout his confinement in the VDOC, including psychotropic medications for depression and PTSD. (Pl.'s Aff. ¶ 7, Docket No. 111.) He also had a prior history of being placed on suicide precautions at other VDOC facilities where he had been confined in 2011 and 2012. (*Id.*) At some point after the medical van incident on November 17, 2014, Thompson began reporting to the mental health staff that he was experiencing visual and auditory hallucinations and needed treatment. (Compl. ¶ 157.) On January 15, 2015, he cut his wrist with a blade removed from a segregation safety razor.

On February 26, 2015, staff found two safety razors and one razor blade extracted from a safety razor inside Thompson's cell. The next day he filed an informal complaint stating that the razor collection practice was placing him in danger of harming himself again. (Pl. Ex. at 73, Docket No. 130.) On March 2, officers x-rayed his property, found four more razors, placed Thompson on suicide precautions, and issued an order that he could only be shaved by a barber. (*Id.* at 69.)

The defendants argue that they are entitled to summary judgment on Thompson's claim that they permitted him to possess a razor in segregation, because he failed to exhaust administrative remedies properly as required under 42 U.S.C. § 1997e(a). They also contend that Thompson's evidence fails to state an Eighth Amendment claim, based on his complaints about razor safety at River North. I conclude that both of these arguments fail.

## 1. The Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA"), among other things, provides in 42 U.S.C. § 1997e(a) that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). To comply with § 1997e(a), an inmate must follow each step of the established administrative procedure that the facility provides to prisoners and meet all deadlines within that procedure before filing his § 1983 action. *See Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006).

The defendants bear the burden of proving the affirmative defense that Thompson failed to exhaust available administrative remedies regarding his claims. *Jones v. Bock*, 549 U.S. 199, 212 (2007). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

## 2. The VDOC Administrative Remedies Procedure

Operating Procedure ("OP") 866.1 is the written administrative remedies procedure that inmates in VDOC facilities must follow to comply with § 1997e(a).[17] (*See* Walls Aff. Attach. 1, Docket No. 116-1.) A grievance is defined as "an unresolved issue filed and signed by an individual offender on his/her own behalf concerning an issue which has affected him/her personally and meets intake criteria." The primary remedy form under OP 866.1 is the regular grievance, which must be filed within thirty days of the incident. Before filing a regular grievance, however, an inmate must first attempt to resolve his issue informally by completing an informal complaint to the appropriate department head. An official is to write a response on

---

[17] The defendants initially submitted with their motion for summary judgment a newer version of OP 866.1 that was not in effect during the events at issue in Thompson's complaint. In response to his objection, counsel for their codefendants submitted the correct version, effective July 1, 2013, as amended on September 25, 2014, April 13, 2015, and July 17, 2015 with annotations reflecting each respective amendment. This version of the policy is substantially the same as the version initially submitted and is consistent with the defendants' exhaustion arguments.

the bottom of the informal complaint form and return it to the inmate within fifteen days. The inmate can then initiate a regular grievance by submitting the grievance form, with the informal complaint attached.

The back of the regular grievance form states several reasons that a regular grievance may be rejected at intake, such as not attaching the informal complaint, making a request for services, or filing the regular grievance outside the required thirty-day time period. If a regular grievance is not timely filed or is otherwise deficient, the intake officer will mark the deficiency on the back of the form and return it to the filer within two working days from the date of receipt. The intake officer makes a copy of the rejected grievance with the justification for rejection noted on the second page. The inmate may resubmit the grievance with the deficiency corrected, or he may appeal the intake decision by mailing his grievance and informal complaint within five days to the regional ombudsman, whose decision is final.

If a regular grievance is accepted at intake as properly filed, then the warden or his designee will investigate the issue raised. If multiple issues are raised, officials will only address one per grievance. The inmate will then receive a Level I response to his regular grievance, reporting the investigation findings and a ruling on the issue raised. If the responding official determines the grievance to be unfounded, for full exhaustion, the inmate must appeal that holding to Level II, for review by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services or Superintendent for Education. Level II is the final level of review for most issues, but in some cases, another appeal is available to Level III for review by the Chief of Corrections Operations or Director of the VDOC.

The time limits for official review is thirty days for issuing a Level I response; twenty days for a Level II response, and twenty days for a Level III response. Expiration of the time

limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal.

### 3. Thompson's Grievances on Razor Safety

Thompson submitted an informal complaint, dated January 25, 2015, stating:

On 1/15/15, I cut my left wrist with a razor blade extracted from a razor I received from segregation staff when I took a shower. Segregation staff are not collecting razors from inmates allowing them to take razors back to the cells. War. Wrigth, Asst. War. Booker, Maj. Mullins, Lt. Miller and U/M Doss, shift commanders and building sgt. Have failed in ther supervisory duties.

(Mem. Supp. Mot. Summ. J. Ex. Walls Aff., Enclosure B, Docket No. 57-4.) Unit Manager Doss responded on January 30, 2015, stating: "You are given a safety razor for use in the shower. Your breaking the razor and cutting yourself as you admitted to was your own doing." (*Id.*)

On January 31, 2015, Thompson filed a regular grievance, stating:

Supervisory staff have a duty to ensure that VDOC policies are followed, such as collecting all razors issued to [inmates] in segregation while showering. Segregation staff do not even ask for the razors back. One C/O gives me the razor, another C/O removes me from the shower[. H]e does not know I was even issued a razor. There is nothing in place to show I was issued a razor that needs to be accounted for. [Inmates] are allowed to throw the razors on the floor in front of the showers[.] C/O can't tell which razor belongs to which [inmate]. I was hearing voices and having visual hallucinations under psychiatric care and allowed to return to my cell with a razor that led to my cutting my wrist.

(*Id.*, Enclosure C.) In answer to the regular grievance form's question, "What action do you want taken?" Thompson wrote, "Stop allowing I/M to return to their cells with razors." (*Id.*) Walls rejected this regular grievance on February 2 as a request for services instead of a grievance. He noted that Thompson "wants procedure followed because he chose to cut his own self with razor after breaking the razor to [retrieve] the blade." (*Id.*)

Thompson chose not to appeal Walls' decision to reject his grievance at the intake stage. Instead, he opted to reframe his complaint on a new regular grievance form, dated February 2, 2015. This document restated the issue from his previous one, but added: "I am under psychiatric t[reatment] for Depression and PTSD [and] take several medications. To allow an [inmate] with these mental health problems [to] have razors in his seg[regation] cell is deliberate indifference. . . . Since 1/15/15 . . . they still allow [inmates] to take razors to their cell[s]." (*Id.*) As to the action he wanted taken, he stated: "stop allowing [inmates] to return to their cells in seg[regation] with razors and compensation for my injuries." (*Id.*) Walls rejected this regular grievance as a request for services, again noting that Thompson "wants officers to collect razors when offenders are finished with their shower." (*Id.*) Thompson claims that when Walls returned the regular grievance on February 3, the informal complaint was not attached to it as it should have been to allow appeal or resubmission of the regular grievance with revisions.

Again, Thompson chose not to appeal the intake decision and filed another regular grievance, dated February 4, 2015. He repeated his previous statements, but added that he had been "experiencing auditory and visual hallucinations since Dec. 2014." (Pl.'s Ex. at 82, Docket No. 130.) He also noted that "on 2/3/15 you returned rejected griev[ance] without [the informal complaint] attached." (*Id.*) For the action to be taken, Thompson stated: "Compensation for serious injury." (*Id.*) Walls rejected this regular grievance at intake because the informal complaint was not attached, noting that the informal complaint *had* been attached to the grievance form and sent back to Thompson. (*Id.* at 83)

Thompson continued to submit regular grievances about lax enforcement of the razor safety procedures and the danger this practice posed to him as a mentally ill inmate. His regular grievance dated February 5, asking for compensation for his injury and again complaining about

the unreturned informal complaint, was rejected by a different grievance coordinator for failure to attach the informal complaint. (*Id.* at 84-85.) His regular grievance dated February 8, asking for compensation for his injury and with the receipt for his informal complaint attached, was rejected by Walls for failing to attach the informal complaint itself. (*Id.* at 86-87.) His nearly identical regular grievances, dated February 10 and 11, with the informal complaint receipt attached, were rejected by Walls as requests for services. (*Id.* at 88-91.) Thompson appealed the intake decision on the February 11 regular grievance, but the regional director upheld Walls' rejection decision. (*Id.* at 91-92.)

### 4. Material Disputes about Exhaustion

Walls states that according to the grievance records he reviewed in preparing his affidavit for this lawsuit, Thompson filed only two regular grievances (dated January 31 and February 2) and failed to appeal the intake decision. Nothing in the record suggests, however, that the copies of other regular grievances Thompson has submitted are not authentic. This discrepancy about how many regular grievances Thompson filed is a material factual dispute precluding summary judgment for the defendants under 42 U.S.C. § 1997e(a). Moreover, given the reasons for rejection of his regular grievances about his January 15 razor injury, it is difficult to see that he had an available administrative remedy on his failure to protect claim. In such circumstances, an inmate's claim cannot be dismissed for failure to exhaust. *See Moore*, 517 F.3d at 725. Therefore, I cannot find that the defendants have established failure to exhaust administrative remedies and will address Thompson's razor safety claim on the merits.

**5. Failure to Protect Thompson from Self-harm with a Razor**

"[P]rison officials have a duty to protect prisoners from self-destruction or self-injury." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992); *Taylor v. Friedman*, No. 5:14CT3065-H, 2015 U.S. Dist. LEXIS 33498, at *13, 2015 WL 1284236, at *5 (E.D.N.C. Mar. 18, 2015) (concerning distribution of a razor to an inmate who used it to attempt suicide). To prove a § 1983 claim against officials for failing to protect him from injury, including self-injury, the prisoner plaintiff must establish: (1) he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) the defendant prison official had a "sufficiently culpable state of mind," one of "deliberate indifference." *Farmer*, 511 U.S. at 834 (harm from other inmates); *Gordon*, 971 F.2d at 1094 (self-harm). Deliberate indifference is "somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995).

An inmate may prove deliberate indifference through direct or circumstantial evidence, and "[d]irect evidence of actual knowledge is not required." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). The plaintiff may satisfy the deliberate indifference element with evidence that the challenged circumstances created a "substantial risk" of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* Even without direct evidence, "an injury might be so obvious that the factfinder could conclude that the [official] did know of it because he could not have failed to know of it." *Id.*

> Accordingly, prison officials may not simply bury their heads in the sand and thereby skirt liability. [An official] may not escape liability if it is shown, for example, that he merely refused to verify underlying facts that he strongly suspected to be true, or that he declined to confirm inferences of risk that he

strongly suspected to exist. And it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. Nor is it dispositive that the prisoner did not give advance warning of the risk or protest his exposure to the risk.

A prison official remains free to rebut the deliberate indifference charge, even in the face of an obvious risk. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. But absent successful rebuttal, they may be held liable for obvious risks they must have known.

*Makdessi*, 789 F.3d at 133-34.

In moving for summary judgment, the defendants point out that Thompson had not been placed on suicide precautions at River North prior to the January 15 incident when he cut his wrist. Prior to submitting the informal complaint and many regular grievances about that incident, starting on January 25, 2015, he had not filed any complaints or grievances that access to razors put him at risk to harm himself. (Walls Aff. at ¶ 15.) Only when a QMHP placed an inmate on suicide precautions would the security officers and supervisors in his pod know that he was at risk of attempting suicide or otherwise harming himself. (Fletcher Aff. ¶ 23-25.) Security officers have no access to inmates' mental health records. (*Id.* at ¶ 26.)

None of the defendants is a QMHP. They argue that their evidence establishes that they had no knowledge before Thompson's self-inflicted wrist injury on January 15, 2015, that he had suicidal tendencies and so they should not be found deliberately indifferent to the dangers posed by the challenged razor practices. *See Taylor*, 2015 U.S. Dist. LEXIS 33498, at *14, 2015 WL 1284236, at *5 ("[The key inquiry when determining whether a prison official exercised deliberate indifference to the health of safety of a prisoner who suffers from suicidal tendencies

is whether the defendants knew, or reasonably should have known, of the prisoner's suicidal tendencies.").

Although the *Makdessi* case claimed officials' deliberate indifference to an excessive risk that the plaintiff inmate would be harmed by other inmates, rather than by himself, its analysis is controlling here. Under its precedent, I cannot agree that the defendants have established that no material factual disputes could support Thompson's claim of failure to protect in these circumstances. Liberally construed, Thompson's submissions present disputed facts on which he could persuade a reasonable fact finder that unit manager Doss knew—from the December 3, 2014, razor incident and/or from observing the razor recollection practices themselves—that the razor policy was routinely not followed, creating an excessive risk that Thompson or others would take razors from the shower area and potentially harm themselves or each other, but Doss disregarded this risk. I will, therefore, deny the motion for summary judgment as to Doss as to Claim (2)(E) in his individual capacity.[18],[19]

I will grant summary judgment for the other defendants named in Claim (2)(E), however. Thompson does not allege facts showing that he notified any of these defendants of the dangerous shower practices or that they personally observed or participated in them before he was injured on January 15, 2015. *See Iqbal*, 556 U.S. at 676 (holding "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution" to state § 1983 claim).

---

[18] To the extent that Thompson brings this action against Doss in his official capacity for monetary damages, his claim is not cognizable in § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).

[19] The same factual disputes that preclude summary judgment on the merits of this claim also preclude Doss' argument for qualified immunity. *See Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995).

### III.

For the reasons stated, I will grant defendants' motion for summary judgment in part and deny it in part. I will deny the motion as to Claim (2)(E) against defendant Doss in his individual capacity for failing to protect Thompson from self-injury because of unsafe razor distribution practices. I will grant summary judgment to all other defendants as to all other claims in Count (2) of Thompson's complaint.

An appropriate order will enter this day.

ENTER: This 31st day of March, 2018.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE