# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| PAUL C. THOMPSON, JR., *Plaintiff*, v. H. W. CLARKE, *et al.*, *Defendants*. | CASE NO. 7:17-CV-00010 <br> MEMORANDUM OPINION <br> JUDGE NORMAN K. MOON |

## INTRODUCTION

Paul C. Thompson, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging retaliation and Eighth Amendment claims against various officials employed by the Virginia Department of Corrections. Defendants filed a second joint motion for summary judgment, Dkt. 216. Thompson responded on November 13, 2019, Dkt. 223, making this matter ripe for disposition. Thompson has also filed a "Motion for Ruling," Dkt. 224, in which he objects to allegedly ex parte communications between counsel for Defendants and the magistrate judge assigned to this case, Judge Joel Hoppe, and requests that Judge Hoppe be removed from any civil actions involving Thompson.

The Court will grant Defendants' second motion for summary judgment. Further, it will deny the motion to remove Judge Hoppe from Thompson's civil actions.

## I. FACTUAL BACKGROUND

Thompson's Section 1983 complaint set out five "counts," each encompassing numerous claims arising from events that occurred in 2014 and 2015 while he was confined at River North

Correctional Center ("RNCC").[1] In my previous opinions, I dismissed several defendants and summarized Thompson's remaining claims. *See, e.g.*, Dkt. 144. Thus, I offer only a brief overview of Thompson's remaining claims here.

(1) Defendants Booker, Evans, Whitt, Jones, Thompson, Doss, and Shaffner retaliated against him for then-litigating and planning to litigate a number of civil actions by unnecessarily prolonging seizure of his legal materials after he was removed from suicide watch, which adversely affected his ability to litigate his cases;

(2) Defendant King retaliated against him for the same litigation when he did not award sentence credit for time Thompson spent in pre-hearing segregation for a "212 [disciplinary] charge," which unduly increased the time Thompson was kept separate from his legal materials while his litigation continued;

(3) At least two Defendants conspired to retaliate against Thompson; and

(4) Doss was deliberately indifferent to an excessive risk of harm regarding the razor retention policy in the shower area.

Dkt. 178 at 1–2. I will reference the claims as numbered above.

In the Court's order on Defendants' previous motion for summary judgment, this case was referred to Judge Hoppe for further proceedings, including an evidentiary hearing and preparation of a Report and Recommendation, in order to resolve the dispute between the parties as to whether Thompson had properly exhausted the first three of the above claims. Dkt. 179. Defendants later filed a motion to withdraw their affirmative defense that Thompson had failed to properly exhaust his available administrative remedies, Dkt. 208, which Judge Hoppe granted, Dkt. 209. The

---

[1] On March 26, 2015, Thompson was transferred from RNCC to Red Onion State Prison, where he is currently confined. Dkt. 149 at 1 n.2.

parties were subsequently directed to file any additional motions for summary judgment within sixty days. Thereafter, Defendants filed this second motion for summary judgment, Dkt. 213.

In his response to Defendants' second motion for summary judgment, Dkt. 223, Thompson argues that the Defendants failed to address "the issue of no coat issued in winter for outside recreation," Lieutenant Colna's administration of restraints on January 15, 2015, and the claims against Defendants Montgomery, Miller, and Wells. Defendants had no need to address these claims, because these claims, including all those against Defendants Montgomery, Miller, and Wells,[2] have already been dismissed. Dkt. 148 at 13 (granting summary judgment on failure-to-provide-cold-weather-clothing claim); *id.* at 16 (granting summary judgment on excessive-force claim against Colna for his administration of restraints); Dkt. 178 at 7 (granting Defendants' motion for summary judgment on cold-weather-clothing retaliation claim, including against Miller); Dkt. 149 (dismissing all claims in Counts III, IV, and V against a number of defendants, including Montgomery and Miller, and dismissing all retaliation claims in Claims I and II against Montgomery); Dkt. 148 (granting Defendants' motion for summary judgment on all Eighth Amendment claims in Count II against all Defendants, including Montgomery and Miller, except as to Doss); Dkt 179 (granting Defendants' motion for summary judgment on last remaining retaliation claim against Miller). In his memorandum in opposition to Defendants' motion for summary judgment, Thompson also continually refers to Defendants' alleged withholding of his legal materials after he was transferred to Red Onion State Prison. However, the Court need not address this claim, as it also has already been dismissed. Dkt. 149 at 10.

---

[2] Plaintiff originally filed claims against two different defendants by the name "Wells." While he does not specify which he is referencing, both have been dismissed, *see* Dkts. 52, 139.

## II.   LEGAL STANDARD

Defendants move for summary judgment as to the claims listed on page 2, *supra*. Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The dispute over a material fact must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). As such, the moving party is entitled to summary judgment if the evidence supporting a genuine issue of material fact "is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 250.

The moving party bears the burden of proving that judgment on the pleadings is appropriate. *Celotex Corp. v. Catretti*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, the Court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 322–24; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1993).

### III. ANALYSIS

### A. Retaliation Claims: Claims 1–2

"Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable [under Section 1983] because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union v. Wicomico Cty.*, 999 F.2d 780, 785 (4th Cir. 1993). Specifically, prison officials may not retaliate against an inmate for exercising his constitutional right to access the court, *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978), nor may they take actions that violate his First Amendment "right to file a prison grievance free from retaliation." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017).

On the other hand, the Court must treat an inmate's claim of retaliation by prison officials "with skepticism because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).

> [T]o state a colorable retaliation claim under Section 1983, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct.

*Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018). "For purposes of a First Amendment retaliation claim under Section 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* Inmates also "must come forward with specific evidence establishing that *but for* the retaliatory motive, the complained incident . . . would not have occurred." *Oliver v. Myers*, No. 7:08-cv-558, 2008 WL 5212409, at *2 (W.D. Va. Dec. 12, 2008) (emphasis supplied). In defending against the retaliation claims against them, Defendants do not contest that Thompson's litigation and submission of grievances

5

constituted a protected First Amendment activity. Thus, the Court examines whether there is any material dispute of fact as to the remaining two prongs of his retaliation claims under Section 1983.

To determine whether a plaintiff has suffered an adverse action, the Court must make an objective inquiry that examines the specific facts of each case, taking into account the actors involved and their relationship. *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006). Because "conduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, . . . a plaintiff need not actually be deprived of [his] First Amendment rights in order to establish . . . retaliation." *Constantine*, 411 F.3d at 500. Nonetheless, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill such activity." *Id*.

The test for causation requires an inmate to show that, but for the exercise of the protected right, the alleged retaliatory act would not have occurred. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). An inmate experiencing an adverse action shortly after a correctional officer learns that the prisoner engaged in a protected activity may create an inference of causation, but, generally, mere temporal proximity is "simply too slender a reed on which to rest a Section 1983 retaliatory [ ] claim." *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding an inference of causality only if "the temporal proximity [is] very close"). "The Fourth Circuit has not set forth a specific timeframe for what constitutes very close." *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 250 (D. Md. 2016). Nevertheless, even if the temporal proximity is insufficient to create an inference of causation, "courts may look to [events that might have occurred during] the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

6

Thompson claims that Defendants Booker, Evans, Whitt, Jones, Thompson, Doss, and Shaffner retaliated against him for then-litigating and planning to litigate a number of civil actions when they unnecessarily prolonged seizure of his legal materials after he was removed from suicide watch, adversely affecting his ability to litigate his cases. He further claims that Defendant King retaliated against him for the same litigation when he did not award sentence credit for time Thompson spent in pre-hearing segregation for a "212 [disciplinary] charge," which unduly increased the time Thompson was kept separate from his legal materials while his litigation continued.

But even assuming that the Defendants took some action that adversely affected Thompson's First Amendment rights,³ Thompson has failed to "come forward with specific evidence establishing that *but for* the retaliatory motive, the complained incident . . . would not have occurred." *Oliver*, 2008 WL 5212409, at *2 (emphasis supplied). In both Claim 1 and Claim 2, Thompson relies exclusively on the temporal proximity between Defendants' alleged adverse actions and his own steady stream of ongoing litigation⁴ to establish the necessary causal

---

³ Indeed, it is not clear that Plaintiff *did* in fact suffer an adverse action that chilled the exercise of his First Amendment rights. "[T]he plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill such activity." *Constantine*, 411 F.3d at 500. Thompson himself states that "Thompson chooses to press on with his legal work in spite of all the retaliation over the past few years" and "Defendants attempt to use that against me but it's how I persevere through." Dkt. 223 at 7. Defendants have also pointed to the docket sheets in Thompson's pending cases, some of which demonstrate that his filings did not slow after the alleged adverse action he received at RNCC. *See* Dkts. 217-9, 217-10, 217-11. Nevertheless, because the Court finds that there is no material dispute of fact that Thompson has failed to meet the third prong, any dispute of fact as to whether Plaintiff did suffer an adverse action is not material.

⁴ Specifically, in his verified complaint, Thompson states that the retaliation is in response to a number of his civil actions that were then-pending and his plans to file both *Thompson v. H.W. Clarke, et al.,* No. 2:15-cv-00439 as well as the instant case. Dkt. 1 at 45–46.

connection.[5] Dkt. 223 at 8. The record does not include any evidence of comments from Defendants that might relate their allegedly adverse actions to Defendants' litigation or any comments from Defendants that so much as suggest that they were aware of Thompson's civil litigation against VDOC employees. *Cf., e.g., Jackson v. Castevens*, No. 7:18-CV-00362, 2020 WL 1052524, at *3 (W.D. Va. Mar. 4, 2020) (finding disputes of fact precluding summary judgment where defendant-officer said "a lesson was about to be taught" and that he was going to "get [plaintiff-inmate] back" for filing grievances before electrocuting plaintiff-inmate). Further, Thompson has not even pointed to any specific occasion that Defendants became aware of his pending civil actions or plans to file future claims. In his verified memorandum in opposition to the second motion for summary judgment Thompson, instead, claims that Defendants "knew Thompson was a litigator" because he attended the law library weekly, often requested notary service, sent legal mail several times a week, spoke to Defendants about "his legal work and legal needs," and had filed numerous "grievances surrounding legal issues." Dkt. 223 at 6.

Although his line of argument is not always easy to discern, Thompson appears to argue that the causal-connection requirement has been met because the allegedly adverse treatment he suffered occurred while he was litigating his active cases and planning his future litigation. The Court disagrees. The consequence of accepting such an argument would be that any prisoner with pending litigation would succeed in establishing a causal connection between any adverse treatment and their pending suit, merely by virtue of their coincidence. The but-for standard is

---

[5] Indeed, the only reasonably identifiable reference that Plaintiff's memorandum opposing summary judgment makes to the necessary causal connection is as follows: "[The] temporal proximity between Thompson's accessing the grievance procedure, actually having civil actions against other facilities in the court, and plans to file this civil action, which defendants had knowledge of due to Thompson telling them he was and the adverse actions/inactions by the defendants." Dkt. 223 at 8.

more "rigorous" than this. *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) ("Of note, our causal requirement is rigorous." (internal quotations and citations omitted)). As Thompson's theory would require this Court to accept mere coincidence and speculation as satisfaction for the causal requirement, I will award summary judgment on these claims to Defendants.

Claim 3: Civil Conspiracy

The entirety of Thompson's argument in support of his claim that Defendants engaged in a civil conspiracy against him is as follows: "Clearly [multiple] defendants [retaliated] against Thompson in a variety of manners. It took more than one defendant to hold the legal materials for several months. More than one C/O to not collect razors from Dec. 2014 thru March 2015. Doss failed to correct policy to collect razors."[6] Dkt. 223 at 9.

Thompson faces "a weighty burden to establish a civil rights conspiracy. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). To establish a civil conspiracy under § 1983, a plaintiff is required to produce evidence showing that the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, resulting in the deprivation of a federal right. *Glassman v. Arlington Cty.*, 628 F.3d 140, 150 (4th Cir. 2010) (citing *Hinkle*, 81 F.3d at 421). Whether through direct or circumstantial evidence, a plaintiff must demonstrate that each member of the alleged conspiracy shared the same conspiratorial objective, and the factual allegations must reasonably lead to the inference that the defendants came to a mutual understanding to try to "accomplish a common and unlawful plan." *Hinkle*, 81 F.3d at 422. Thompson has failed to do so here. Rather, he provides little more than "rank speculation and conjecture" that Defendants had engaged in a conspiracy to retaliate against him. *Id.* Thus, in

---

[6] This appears to be the first occasion that Thompson has argued that the failure to collect razors was a means of retaliating against him, and so the Court will not address this argument as an independent retaliation claim.

9

addition to his failure to evince the underlying constitutional violation necessary for a civil conspiracy under Section 1983, Thompson has provided no evidence that any of Defendants positively, or even tacitly, came to an agreement to violate his civil rights, *see Clark v. Bridges*, 211 F. Supp. 3d 731, 751 (D.S.C. Sept. 30, 2016). Therefore, I will award summary judgment to Defendants on this claim.

### B. Failure to Protect Claim: Claim 4

"[P]rison officials have a duty to protect prisoners from self-destruction or self-injury." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992); *Taylor v. Friedman*, No. 5:14CT3065-H, 2015 WL 1284236, at *5 (E.D.N.C. Mar. 18, 2014) (concerning distribution of a razor to an inmate who used it to attempt suicide). To prove a Section 1983 claim against officials for failing to protect him from injury, including self-injury, the prisoner plaintiff must establish: (1) he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) the defendant prison official had a "sufficiently culpable state of mind," one of "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (harm from other inmates); *Gordon*, 971 F.2d at 1094 (self-harm). Deliberate indifference is "somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Further, in order to succeed on a failure-to-protect claim for damages, a plaintiff must show that the harm suffered was objectively serious. *See Williams v. Shearin*, No. 12–cv–1314, 2013 WL 2295677, at *7 (D. Md. May 23, 2013).

An inmate may prove deliberate indifference through direct or circumstantial evidence, and "[d]irect evidence of actual knowledge is not required." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). The plaintiff may satisfy the deliberate indifference element with evidence that the challenged circumstances created a "substantial risk" of harm that "was longstanding,

pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* Even without direct evidence, "an injury might be so obvious that the factfinder could conclude that the [official] did know of it because he could not have failed to know of it." *Id.*

> Accordingly, prison officials may not simply bury their heads in the sand and thereby skirt liability. [An official] may not escape liability if it is shown, for example, that he merely refused to verify underlying facts that he strongly suspected to be true, or that he declined to confirm inferences of risk that he strongly suspected to exist. And it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. Nor is it dispositive that the prisoner did not give advance warning of the risk or protest his exposure to the risk.
> A prison official remains free to rebut the deliberate indifference charge, even in the face of an obvious risk. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. But absent successful rebuttal, they may be held liable for obvious risks they must have known.

*Makdessi*, 789 F.3d at 133–34.

The facts presented in this case are similar to those in *Taylor v. Friedman*, 2015 WL 1284236, and the Court finds the reasoning in that case instructive. The court in *Taylor* held that a defendant-officer did not violate the Eighth Amendment when he distributed a razor to a plaintiff who subsequently used the razor to cause self-harm. The plaintiff in that case had not been on suicide watch or exhibited any suicidal ideations in the time leading up to when he received the razor, but he had attempted suicide on two occasions three years prior to the attempt that gave rise to his claim. One of these suicide attempts had even occurred at the same institution that later provided him with the razor he used to cause self-harm. The *Taylor* court held that the evidence in

11

that case did not support a finding that the defendant-officer "actually knew of, and then intentionally disregarded, an objectively serious risk that plaintiff would harm himself with the disposable razor." The court took pains to note that "the significant lapse in time between plaintiff's last purported suicide attempt in 2010 and his [self-harm] conduct in 2013 [with the distributed razor] attenuates any hint that Officer Pillmon had reason to know of plaintiff's alleged suicidal tendencies—much less acted in intentional disregard of such a risk."

Thompson has stated in his verified memorandum in opposition to the currently pending second motion for summary judgment, Dkt. 223, that Doss "in general knew Thompson was going through a [difficult] period due to his prolonged period in segregation [from] Nov. 16, 2014 [through] Mar. 26, 2015 and [as evidenced by] Thompson's [unusual] behavior of throwing water on nurses." *Id.* at ¶ 25. Further, Thompson has previously noted that his VDOC record reflects a history of being placed on suicide precautions at other institutions in November 2011 and November 2012—before his arrival at RNCC. Dkt. 117-1 at 21.

But Thompson's behavior of throwing water on nurses is insufficient to signal to Doss that he was at risk of suicide. *See State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983) (holding that knowledge that a prisoner acted violently or "in a 'freaky' manner" is not "synonymous with having reason to know that the violence might become self-directed"). And, more importantly, there is nothing in the record that suggests that Doss actually knew of Thompson's suicidal tendencies before his self-harm incident on January 15, *see* Dkt. 57-1 at ¶ 7, nor is there any suggestion that Doss was or reasonably should have been familiar with Thompson's history of suicide precautions while at different institutions two to three years prior to his time at RNCC. *See Taylor*, 2015 WL 1284236, at *5–6. While Thompson claims that his VDOC records "verify" that he has been on suicide precautions at two wholly different institutions

before his arrival at RNCC, Dkt. 117-1 at 21, his VDOC records have not been provided and there is no evidence in the record that reflects that Doss was aware of these prior suicide precautions. In any event, just as in *Taylor*, Thompson's prior suicide precautions would have been too attenuated to put Doss on notice of the risk he faced in the time leading up to the January 15 self-harm incident—all the more so because the plaintiff in *Taylor* had attempted suicide in the same institution as that which gave rise to his failure-to-protect claim, while both of Plaintiff's suicide precautions were at different institutions.

Even assuming that Doss was negligent in his supervision of the razor collection policy in the time leading up to Thompson's self-harm incident on January 15, 2015, the evidence in the record does not support a finding that he was deliberately indifferent to an excessive risk that Thompson would use the razor to commit self-harm. Without any prior awareness that Thompson had suicidal ideations, the risk of Thompson committing self-harm was not an "obvious" one to Doss or his subordinates. *See Makdessi*, 789 F.3d at 133–34; *Belcher v. Oliver*, 898 F.2d 32, 35 (4th Cir. 1990) (holding that defendant-officers were not deliberately indifferent when they failed to adhere to a policy requiring them to remove belt and shoelaces of inmate who hanged himself with his own belt in his jail cell where defendants had no reason to be aware of inmate's suicidal ideations). Therefore, I will award summary judgment to Doss on this claim.

In an earlier interlocutory order in this case, ruling on a partial motion for summary judgment, Dkt. 148—which dealt with a variety of claims and was jointly filed by a number of Defendants, including Doss—I had concluded that there was a material dispute of fact that prevented the Court from granting summary judgment in Doss's favor on this failure-to-protect claim. I had previously acknowledged that either Thompson's December 4, 2014, disciplinary charge for possession of safety razors or Doss's observation of the razor collection practices

13

themselves could persuade a reasonable factfinder that Doss both created and knew of an excessive risk that Thompson or others would take razors from the shower area and potentially harm themselves or each other. Dkt. 148 at 28. But as this litigation has developed, new facts and arguments relevant to Thompson's failure-to-protect claim have come to light, and this Court concludes that on the full record before this Court, there is no genuine issue of material fact on this claim. Doss is entitled to summary judgment. *See Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (stating that Rule 54(b) provides broader flexibility to revise interlocutory orders before final judgment "as the litigation develops and new facts or arguments come to light").

In particular, the Court now has before it the affidavit of the last remaining defendant on this claim, Dkt. 217-1, which had not been included in the prior motion for partial summary judgment on this claim, Dkt. 56. On further review of the record and the parties' additional briefing,[7] I find that my earlier conclusion constitutes a clear error which would lead to manifest injustice. *See* Fed. R. Civ. P. 54(b) (stating that "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"); *Carlson*, 856 F.3d. at 325.

---

[7] Thompson attached to his verified memorandum in opposition to Defendants' second motion for summary judgment, Dkt. 223, an "affidavit" from Carlito R. McToy. This affidavit was neither signed nor dated by McToy or any other party. It was not notarized, nor did it include any language that the statement was declared under penalty of perjury. Thus, it fails to satisfy even the basic requirements for unsworn declarations under penalty of perjury per 28 U.S.C. § 1746. The Court is therefore unable to consider this document on its review of this motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (providing that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations"); *Sims v. Davis*, No. 7:18-cv-00551, 2020 WL 572730, at *7 n.2 (W.D. Va. Feb. 5, 2020).

### C. Ex Parte Communications

Thompson has also filed a "Motion for Ruling," Dkt. 224, in which he objects to allegedly ex parte communications between Laura Maughan, counsel for Defendants and Judge Joel Hoppe—the magistrate judge assigned to this case—on July 16, 2019. Thompson alleges that Maughan and Judge Hoppe "engaged in 'ex parte' communications, with the explicitly focused on [*sic*] strategy that would allow Maughan to refile a dispositive motion for summary judgment for a second time." Dkt. 215 at 2.

Thompson also claims that he did not receive notice of Defendants' motion to withdraw their exhaustion defense, nor Judge Hoppe's order granting it, in advance of a scheduled status conference that replaced the evidentiary hearing I ordered Judge Hoppe to conduct on the issue of exhaustion. Further, he contends that as he was not informed of the topic for the phone conference, he was unprepared to mount any argument against Judge Hoppe's order, Dkt. 213, directing the parties to file any subsequent motions for summary judgment within sixty days of that status conference. He requests that Judge Hoppe be removed from any civil actions involving Thompson. The Court will deny his motion.

Nothing in Thompson's motion signals that Judge Hoppe engaged in any impropriety. Thompson makes bare and conclusory allegations of ex parte communications, failing to provide any evidence as to the content of the alleged communications. *See Cleveland v. Hall*, No. 6:15-cv-4384, 2016 WL 2892728, at *2 (D.S.C. May 18, 2016) (examining exhibits attached to objections to ex parte communications). In other words, his claim is entirely speculative.

Further, the decision whether to hold a status conference and on what date is squarely within the magistrate judge's discretion. Plaintiff had the opportunity to attend that status conference, and he did so. That he had not yet received at the time of the status conference the

physical copies of Defendants' withdrawal motion or Judge Hoppe's order granting it is of no matter. Further, Thompson failed to provide any facts that would show prejudice to him as a result of the magistrate judge's decision—in fact, the elimination of the evidentiary hearing and the withdrawal of the exhaustion defense could only have been to his advantage.

Further, the Court sees no harm in directing the parties to file additional motions for summary judgment after the withdrawal of an affirmative defense. Indeed, this procedure is expressly contemplated by *In re Procedures for Prisoner Cases and Provisions for Custody of Prisoners*, Standing Order No. 2019-5 (W.D. Va. Aug. 2, 2019) ("The court may direct a party or parties in a prisoner case to file a motion for summary judgment supported by affidavits."), and its predecessor, Standing Order No. 2013-6. Accordingly, I will deny Plaintiff's "Motion for Ruling," Dkt. 224.

## Conclusion

In an accompanying Order, the Court will grant Defendants' second motion for summary judgment and deny the motion to remove Judge Hoppe from Thompson's civil actions. As all of Plaintiff's claims against all Defendants have been eliminated through dismissal or the award of summary judgment in favor of Defendants, the action will be stricken from the active docket of the Court.

An appropriate order will be entered.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to Plaintiff and all counsel of record.

**ENTERED** this  6th   day of March, 2020.

*/s/ Norman K. Moon*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE